Case number 17-5252. Sunday Iyoha, Appellant v. Architect of the Capitol, Care of General Counsel, Courthouse Office Building H2-265A. Mr. Alderman for the Appellant, Mr. Walker for the Affiliate. Good morning, Your Honors. May it please the Court, I'm Les Alderman. I represent Mr. Iyoha, who is here with us in the audience today. Your Honors, you hear this all the time, that in this case there was too much evidence for summary judgment to be appropriate. And you'll hear it again today. There was too much evidence in this case for summary judgment to be appropriate. In 2012, we have a res judicata decision that Mr. Iyoha was removed as Help Desk Manager by the same two supervisors who gave false reasons for removing him, false performance-based reasons for removing him. Those supervisors continued to make statements and comments, derogatory, about Mr. Iyoha's accent from 2011 all the way up to 2014, the year of the first selection. In addition to that, in addition to the evidence of discriminatory animus, you also have a selection process that was not fairly administered towards Mr. Iyoha. You have the same two supervisors. Isn't the key decision-maker here Ms. Clark? Ms. Clark is one of the key decision-makers. Let's just focus on her. What's the evidence of discrimination by Ms. Clark? Well, Judge Griffith, it's undisputed that Ms. Clark was involved with Mr. Wiegman in the planning and the effectuation of the first reorganization that removed Mr. Iyoha from his Help Desk position in 2012. That's undisputed. Ms. Clark also joined in— Does that alone preclude her from ever being engaged? Was there any remedial action that was taken? There was no remedial action. So does that preclude her from being involved in the decision-making process later? Your Honor, what I think it does is that it makes it foolish for the architect not to implement measures that insulate the decision from her discriminatory animus. Put in an independent observer— Well, what did she do? Just focusing on her. What did she do that displayed discriminatory animus in the later selection process? Even before the selection occurred, she decided that she would not have even interviewed Mr. Iyoha despite the fact that he had performed most of the duties of the position and received outstandings commendations from customers. She said she wouldn't have even interviewed him. And she told that to Mr. Wiegman, who also was on the panel right around the time of the interviews. Your Honor, there's one mistake that I need to correct on the factual side of things. In our brief, we said that Ms. Clark told Mr. Wiegman during both selections that she would not have interviewed Mr. Iyoha. She thought that during both selections. She only told Mr. Wiegman that on or around the first selection. She did not repeat it at the second selection. When you say she thought that, she testified that she thought that? Yes, Your Honor. She said, and for the second selection, too, I would not have interviewed him except I was required to do so by architect rules. What do you think about the assumption inherent in the question you were asked? Was she the only decision-maker here? She was not the only decision-maker. Why not? Well, she and Mr. Wiegman, at least during the first selection, both ran that selection. They both had votes in that selection. And Mr. Wiegman and she, according to the other panelists, advised the other panelists on the quality of the technical questions. So they both were able to influence the selection. Yes, on paper, it says Ms. Clark was the selecting official. But the district court ruled that both, actually not just both, all three, Clark, Wiegman, and Hernandez should be considered deciding officials in this case. The architect of the capital did not cross-appeal. That is part of the law of the case, is that all three are decision-makers. And all three exhibited animus. Don't forget that Ms. Hernandez made fun of Mr. Eo's accent, said she needed a translator, and he said that that was in 2013 and 2014. Under Morris, where evidence of discriminatory animus, even if it's two or three years old, is still relevant and powerful, Ms. Hernandez's comments are equally powerful in this case. How do you distinguish this case from Porter v. Shaw? In Porter, we said that the fact that there had been a finding of misconduct did not forever disqualify someone from being involved in the selection process. In that case, we thought summary judgment was sufficient. Your Honor, my reading of Porter v. Shaw and the district court decision in Porter is that there was absolutely no dispute that the influence that the deciding official exercised over the selection, there was nothing inappropriate about it. There was nothing strange or suspicious about it. The one piece of evidence that was discussed in the case was that the discriminating official rearranged the position description. But all of the evidence said that the rearrangement actually made the position description fit what the incumbent would actually be doing. So the only evidence that we can discern from those decisions in Porter was the evidence that these discriminatory officials were also involved in a subsequent selection. Your Honor, your question about does that mean that she should forever be ineligible to perform selections, I think that's the tough question. I think it's a very tough question for employers. But I think the first step for the employer is when your supervisor is found to have discriminated, take disciplinary action, send them to training. At least in that case, the architect would have been able to say, here was a moment, yes, they were found to have discriminated against, but we took action, she was suspended for two weeks, which she went to training. There's something that the architect could point to to say, here's something that could change her behavior. In this case, there's none. In fact, both Weidman and Clark testified that their boss, Dave Ferguson, who was the chief administrative officer, he wasn't even upset with them. So not only that, Ms. Clark gets promoted shortly after the discriminatory reorganization, and there are thousands of dollars paid to both of them in performance awards. So not only did the architect not take any action against them, they promoted and paid them thousands and thousands of dollars in bonuses. So they endorsed the discriminatory action. So your argument is your case is more like Salazar, right? But aren't there some significant differences between this case and Salazar? In Salazar, there was this fishiness. There was this furtive moving of decision makers, behind-the-scenes actions. We don't have any of that here. We've got these scorers that seem to be objectively entered and seem to be pretty consistent, and they don't cut in your client's favor. Well, I would say that there is no substantial difference between Salazar and this case. The key thing in Salazar is that someone who discriminated against Salazar in the past was basically in charge. Well, it was also that there was a promise that he wouldn't be. We don't have anything like that. There was a broken promise. That was really important in Salazar. If I were a judge, I wouldn't think that the broken promise was the important thing. The courts that looked at it thought it was important. Because that was a fact in the case. And we don't have that fact in this case. But in terms of suspicious occurrences in this selection, in both of these selections, you have – I think the technical term is fishy. Fishy. Fishy occurrences. You have Ms. Clark who says she never would have even interviewed him. She then picks the panel. On the first selection, three out of the four panelists are people who have made derogatory comments either about Mr. Ioha specifically or about people with accents. Then there's the questions. The interview questions studiously avoid anything about help desk, anything about inventory management. I mean, how hard would it be to ask the question, what's your help desk experience? How do you approach managing a help desk? When Clark admits that managing the help desk was one of the key functions of this job. So just like in Salazar. That's getting us way into the details of a job interview. And we've been cautious about that unless there's something really a sign of direct evidence of bias. Your Honor, there is direct evidence of bias. To neglect to ask about your help desk experience? Well, it is the key. He wasn't interviewing for a help desk job. Actually, Your Honor, Ms. Clark testified that managing the help desk, being the second level of fixer and managing assets and IT inventory were key functions of the job. And she avoided questions on all three fronts. Then when you get into the analysis of the scoring, well, first, there's a dispute of fact over whether Clark and Wigman influenced the other panelists. You have panelists that say that they did. You have other panelists that say that they didn't. That's a dispute of fact. And Mr. Wigman definitely says, someone asked if that was a baloney answer. And if you take a look at Ms. Hernandez's score sheet where she tallied everything up, her response under Mr. Iheoha's weakness was technical answers didn't make sense. That ties the baloney answer comment to Mr. Wigman's advice during the interviews. Other fishiness. At least when you get to the second selection, this surprise second round of interviews, Mr. Lewis says there was no discussion of a second round of interviews. It only happened after we identified who the top scorers were. One of those top scorers was a Hispanic who spoke with an accent. And there's this mysterious second round of interviews that then pops up. And there's all kind of fuzzy testimony about this second round of interviews. Ms. Clark says she was the sole decision maker, that it really didn't matter who gave the best answers. She didn't grade anybody's answers. And there was no real discussion about who the best candidate was. Mr. Wigman, on the other hand. But they ended up hiring people who spoke with that foreign accent. That's right. But look at the big picture. And, again, we have to remember we have to look at all of the evidence altogether. But the big picture, the ultimate selectee, the one who stayed, was an American guy who spoke with no accent. That's what happened in the big picture. Mr. Singh was there for a few months. So your theory that Singh was just a setup, that was just a cover for serious bias? Singh was either a plan or it was a situation that they couldn't do anything about because he scored very well on the technical answers that they asked him. But the important thing with Singh, I think there's two. One, the weaknesses for which they terminated Singh are documented in their interview score sheets. I mean, they said they needed a strong manager who could handle problem employees. And the notes from the interviews say that he's a weak manager. He doesn't have management experience. They also said that they needed someone who was an expert in Microsoft technologies. And Ms. Hernandez's score sheet, at least, says weak in management and in Microsoft. So his weaknesses are actually there from the get-go. And then Ms. Clark misrepresented the facts about his termination. She said in sworn interrogatories and in her deposition that she did not propose Singh's termination. But Singh's declaration and the paperwork that Ms. Clark submitted clearly contradict that. And under Reeves, that contradiction, a false statement about a material fact in the case, could lead a jury to conclude that the real reason was discrimination. And Judge Walton essentially said there's no evidence that she was not being truthful. Well, Mr. Singh's declaration puts a fine point. He says, she told me that she proposed my termination. I checked with Human Resources. They told me that the paperwork had been submitted. And then after I resigned, they told me that the paperwork had been withdrawn. So she clearly, either she proposed the termination formally, or she was telling a huge half-truth about the termination. In either way, a jury could conclude that she was trying to hide her discriminatory or retaliatory animus. And, Your Honors, I think, unfortunately, in the cases, in the decision, the retaliation aspect doesn't get enough attention. Even if you conclude that Singh hurts the discrimination case, it doesn't do anything with the retaliation case. There's no question that Singh ever participated in protected activity. There's no question that the ultimate selectee, he never engaged in protected activity. And Clark's statement, I wouldn't have even interviewed him, despite his past good performance doing the key functions of the job, a jury could easily interpret that as retaliatory animus. With that, I see I've run out of my time. You don't have any of what you've described as direct, we'll put aside whether it's really direct, evidence about retaliation in the way you have about discrimination. There's nobody. No, Your Honor. There's no statements about it. There's no. I think there's strong circumstantial evidence of the retaliatory intent. The question mark that Ms. Clark puts for his strengths, and she says that was a deliberate choice. The testimony that she would not have even interviewed him, despite the fact that he got outstandings when he did this job. These, a jury could certainly conclude, are exhibit retaliatory animus. Then add all the other pretext evidence combined with that, it's certainly a strong retaliation case. But it's not direct evidence of retaliation, as I believe that we do have the direct evidence of discrimination. Okay, thank you. Further questions from the bench? Thank you. Thank you, Your Honor. Good morning, and may it please the Court. My name is Johnny Walker on behalf of the Architect of the Capitol. Your Honor, to get past summary judgment, Mr. Ioha must present some evidence that national origin or retaliatory bias actually played a role in the specific selections at issue in this case. Mr. Ioha. It played a role in the 2012 administrative proceeding, right? That's his position, Your Honor. And to state that position, he relies entirely on this res judicata evidence. Let's just go back to the 2012 proceeding. The administrative proceeding found that there was bias, right? A hearing officer in the Architect's Office of Compliance did find that Mr. Ioha's reassignment was discriminatory, yes. Based on national origin. Based on national origin, yes. And so did the board on appeal. The board affirmed that decision. Now, Mr. Ioha, there are a few things. Now, why shouldn't that affect the way we look at what happens in 2014 and 2015? Well, Your Honor brought up Porter v. Shaw, and Porter v. Shaw is directly on point here. In Porter v. Shaw, this Court specifically held that the involvement of an official that's previously found to have been, this was in the retaliation context, that an official who was previously found by a federal jury to have been guilty of retaliation, the mere fact that they were involved in a later selection process did not indicate that that selection process was. But that's not this case. We have conduct after 2012 in this case showing a continuing bias, right? I don't think the conduct does show continuing bias, Your Honor. I think there are some. Making fun of his accent and commenting that Siri could even translate him? That's not a show of bias. I don't think that Mr. Wigman's comment that his voice recognition software was able to understand Mr. Ioha's accent was at all derogatory towards Mr. Ioha or his national origin. You don't. You don't think that. It's complimentary about the voice recognition software, but I don't think it is derogatory towards Mr. Ioha. Shouldn't a jury decide that? I don't think so, Your Honor, because I don't think there's any reasonable question to it. Wait a second. You're saying there's no reasonable question that when Mr. Wigman said, wow, Siri can even translate you, you don't think there's any reasonable inference that can be drawn from that that that showed some continuing bias by a man who had already been adjudicated to have bias in this area? That's just not reasonable? I don't believe so, Your Honor, and I don't think the record reflects that Mr. Wigman said it quite that way. But even if it is, Your Honor. How did he say it? I'm sorry, I didn't mean to misstate it. There's no direct quote in the evidence, but there's an indication that he marveled that his Siri voice recognition software was able to understand Mr. Ioha's speech despite his foreign accent. And you're saying the only inference that a jury could draw from that is that he was congratulating Siri for a great technical advance? I believe so, Your Honor. I think that's the only reasonable inference. But even if you can infer some animus from that statement, which was made several months before the selection process here, the question is whether or not that animus entered into the selection processes in 2014 and 2015. Now, that's established by Morris. In Morris, you had a number of—Morris v. McCarthy, there were a number of statements by officials, far more animus-driven than the prosecution. Here's what I understand. After Salazar, why would any manager at the AOC allow Mr. Wigman to be involved in the selection process? That just doesn't make any sense to me. You have somebody who's been adjudicated biased with this problem, national origin discrimination. Why should he be allowed to be involved in the selection process that involves the very person who he was found to be biased against? And after Salazar, that suggests there's a taint. It's not on all fours exactly. It's a different fact pattern. But if I'm the attorney counseling my client in the wake of Salazar, I'm not going to let them put someone who's been adjudicated biased involved in the process? Well, as Your Honor says, Salazar does not explicitly prohibit an official previously found to have been driven by bias and a determination from participating in a later selection. And, in fact, Porter specifically says that they are not so prohibited, that it does not entail an automatic inference that that later selection was driven by bias. There are two important facts about Porter, Your Honor. The only distinction that Mr. Yoho's counsel was able to draw from Porter is that there was nothing inherently suspicious or fishy about the influence that was supposedly exhibited by the former retaliating officials in that case. The same thing is true of this case. There's nothing inherently improper about Mr. Wigman's and Ms. Clark's involvement or participation or the way that they conducted these selections. They were conducted extremely by the book, and there was nothing improper about them. Other distinctions from Porter, one is that that case involved a jury finding, a federal jury finding, and that is included to preclusive effect in later litigation. Now, Mr. Yoho claims that the decision of the hearing officer in this case is entitled to preclusive effect in later litigation, and there are a number of reasons why the court should not follow that. Can I ask about that? Why does that make any difference? In Scott, we said prior administrative findings made with respect to an employment discrimination claim may, of course, be admitted as evidence at a federal sector trial de novo. So who cares whether it's race judicata, because right now we're on the question of summary judgment. And it's evidence. We have a prior finding both by the examiner and the board that there was discrimination on the basis of race. Right? That's it. It matters, Your Honor, because it's really not a race judicata issue. It's more of a collateral estoppel or issue. I'm not asking why it's even collateral estoppel. As long as it's evidence, as long as it's evidence that could go before a jury, what's the difference? The question is what happened in that first transfer away from the help desk. Right? And there is a finding of discrimination on the basis of natural origin, which is evidence and can go before a jury, which means a reasonable jury could believe whatever it could believe from that, regardless of whether it was preclusive or not. It matters, Your Honor, because Mr. Eo, however, relies on a number of findings from the hearing officer concerning testimony provided by Ms. Clark, concerning the ultimate determination that there was national origin discrimination that occurred in respect to the assignment. Can we just pass again on what I just said? The ultimate finding on national origin discrimination goes before the jury, according to Scott, correct? Well, I think it depends, Your Honor. If it's preclusive, it means that plaintiff does not have to prove it in this case. And if it's not, he does. No, that's not what we said. We said prior administrative findings, and this is pursuant to Federal Rule of Evidence 8038C, prior administrative findings made with respect to an employment discrimination claim may, of course, be admitted as evidence at a federal sector renewal trial. That's our decision in Scott, according to the Supreme Court's decision in Chandler, according to Federal Rules of Evidence. I think the question, Your Honor, is evidence of what? Evidence of discrimination on the basis of national origin in that first proceeding, not with respect to the current proceeding. He can't claim that, and he's not claiming that. I think, Your Honor, that it cannot be admitted for evidence based on the findings of the hearing officer because there is case law holding. I'm citing a Supreme Court case, our case, and 803. Now, give me a higher set of cases than that that stand for the proposition that a prior administrative finding made with respect to an employment discrimination claim, you find one that says it cannot be put in evidence. That would require an overruling of both our decision and the Supreme Court's decision in Chandler. That same Supreme Court decision in Chandler has been relied on by multiple other circuits to hold that in the employment discrimination context, in the federal employment discrimination context, administrative findings are not entitled to preclusive effect. I'm not saying preclusive. I don't know why you're dying on this hill. This seems like the wrong hill to die on. I'm not arguing or asking about preclusive effect. I'm asking about whether it is evidence that goes before the jury. I'll accept that, Your Honor. Say that it is evidence that the actual retaliation occurred, that the hearing officer's decision can show that the retaliation occurred. It certainly is evidence. It's not preclusive, so other evidence can certainly be entered contradicting. Yes, but when there is a dispute about evidence, at least on that point, summary judgment on that point would not be appropriate, correct? Understood, Your Honor. So assuming that plaintiff has evidence that could show that there was retaliation in the 2012 reassignment. You go back to Porter. That discrimination alone, assuming that it's correct, does not preclude either Mr. Wigman or Ms. Clark from participating in the selections in 2014 and 2015. Now, Porter involved three selections. With respect to two of those selections where employees formally found to have either retaliated or to have been involved in retaliation, remarkably similar to what Mr. Ioha claims here, the Court held that the mere involvement of those officials was insufficient to give rise to an inference of retaliation in the challenged selections. The third selection, the Court, where the Court did hold that there was a reasonable inference of retaliation, the Court looked at the selection itself and it found with respect to that third selection that the plaintiff was substantially more qualified than the selectee because the position description in that case required a bachelor's degree and the plaintiff in that case had a master's and the selectee had no degree whatsoever. Now, you have no similar argument here and certainly no evidence here that Mr. Ioha was substantially more qualified than the selectees in this case, both of whom, I note, bear the same protected class that he is claiming. But there is no evidence that he is substantially more qualified than them. And, in fact, he has specifically declined to make an argument that he is substantially better qualified than them. Can I just ask on this question of whether the testing interviews, etc., were unassailable, what about Clark's point that she did not have to pick the person with the highest scores, the highest scores didn't matter, all that? That's true. I mean, Ms. Clark could have picked whomever she wanted to. She was the citing official. The method of selecting the candidate that she chose to go about was to convene a panel of a combination of subject matter experts and customers of the relevant branch, which is in keeping with the AOC rules, to have each of those interview panelists ask the same questions of every candidate, questions that were tailored to the job specifications required of the relevant position, to have each of those independent panelists score the candidates to tabulate those scores and then to select the person who achieved the highest scores. And that was the first round in 2014. In the 2015 round, she chose to have the top three go on to a second interview round with the first, second, and third-level supervisors and then to follow that with a discussion and then a selection. So while Ms. Clark could have picked anyone she liked, this was the method that she chose to go about, and there's, I mean, the method worked. In the first round selection, Mr. Seng, an individual with a foreign accent, received the top scores from everyone, including Ms. Clark and Mr. Wigman and Ms. Hernandez, all of whom Mr. Ioha claims of having a bias against individuals based on their foreign accent. And in the second round, there was near unanimity with respect to the top three, except for one deviation, and that individual later concurred that the top three were in keeping with all the other panelists' scores and agreed to send those along. Now, importantly, in the second round selection, a candidate with a foreign accent who we identified as AM was rated in the top three by every single candidate, including Ms. Clark, whom Mr. Ioha accuses of foreign accent discrimination. She rated him second. Now, he says that Ms. Clark had some sort of elaborate plan that she later instituted when she discovered that AM was in the top three. She instituted some elaborate plan to somehow block him from being hired. That does not comport with the fact that Ms. Clark rated him second overall of all the other candidates. If she sought to block him, it does not stand to reason that she would rate him as the second overall candidate during the first round interviews. And you said it's carefully tailored to the job. What do you say in response to opposing counsel's argument that several elements of the job were not asked about, namely the management of the help desk, even at the second or third level, inventory, IT inventory? A few things. If you look at the interview questions, Ms. Clark has consistently testified and said to the other interview panelists that the key aspects of this job were supervisory experience and technical expertise. Now, the position Mr. Ioha characterizes it as having some sort of management responsibilities for the help desk. In fact, this was the supervising position for the position that Mr. Ioha previously occupied, which he characterized as the help desk manager. So while the branch chief position had some overarching authority over the help desk, it certainly was not directly involved day-to-day in help desk issues or directly managing the help desk. The record shows that was done by a contractor. There was a contractor who was assigned to be the help desk manager, and there was a different federal employee who oversaw that contract. There were, on occasion, issues that would rise to the level of branch chief, issues that would be escalated past the help desk for resolution by the branch chief, but it wasn't certainly a regular duty. And the record also shows that if Mr. Ioha wanted to talk about his excellent experience in help desk management and asset inventory control, he could have done that in response to any number of these questions. He was not precluded in any way from doing that. There were a number of questions that asked about troubleshooting, perhaps precisely what a help desk does, troubleshoots. And there were questions asking about experience in troubleshooting. Mr. Ioha was not precluded in any way from bringing his experiences to the attention of the interview panel. And there was certainly no evidence that there was any intent to block him from doing so. Thank you. We ask that the Court affirm the decision of the District Court. Thank you. Is there time left for them? All right. We'll give you another minute. Thank you, Your Honor. Your Honor, we would submit that there are important differences between this case and Porter v. Shaw. You've got Ms. Clark's statement that she wouldn't have even interviewed Mr. Ioha. You have three of the four panelists who had made discriminatory or derogatory statements against people with accents. You've got avoiding questions about the key factors of the position. And if you read the record, it's on page 928 of the record. That's where she explains what the primary duties of the position are. Now, sure, Mr. Ioha could have inserted information about his help desk experience on a question that wasn't really related to help desk, and that would have been a non sequitur, and he would have gotten a bad grade on that question, too. But when he was given the opportunity in the elevator speech question, about which there's a dispute whether that had a discriminatory impact, he did talk about his customer service experience, and he didn't get any credit for it. Customer service is a key factor in the help desk management. You're the second level, you know, above the help desk staffers. He talks about all of his customer service experience, and it didn't get him any credit. You've got all these subjective questions. Thank you very much. Also, the subjective nature of the questions, there are no right or wrong answers to any of these questions. And the judge says, well, we don't even consider that unless it is a relative qualifications case. That's simply not true. Highly subjective questions are relevant no matter what kind of case it is, because they're always suspicious, and they're always a great vehicle for discrimination. Thank you very much, Your Honor. We obviously ask that you overturn the district court's decision. All right, thank you. We'll take the matter under submission.
judges: Garland, Rogers, Griffith